UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                            Case No. 25-CR-194

ZACHARY J. VOGT,

        Defendant.

---

**DEFENDANT'S SENTENCING MEMORANDUM**

---

Zachary J. Vogt, by counsel, hereby submits this sentencing memorandum in support of a sentence for the mandatory minimum permitted under the law, 15 years (180 months). At paragraph 21 of the plea agreement, the government also agrees to recommend the mandatory minimum sentence of 15 years (180 months), thereby making this a joint recommendation. *See also* PSR @ ¶ 7.

Children, whether in primary, middle, or high school, are constantly connected to their phones and immersed in social media. Online dating, messaging apps, and countless internet platforms now serve as common avenues for social interaction. It is no longer unusual for couples, whether adults or minors, to say they met online. With this digital landscape becoming the norm and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

1

children gaining access to phones and the internet at increasingly younger ages, the risk of more young people becoming involved in internet offenses involving CSAM continues to grow. Although this behavior is something we must work to prevent, the consequences are devastating, not only for the victims, but for the offenders as well. This is undeniably a serious offense. Because S.F. is legally incapable of consenting to this conduct, Vogt faces a mandatory sentence of 15 years in prison, years that will encompass much of his young adulthood. It should be noted that there are no allegations that Vogt used threats, intimidation, violence, or force. By all accounts, S.F. was a willing participant in the relationship, the sexual activity, and the recording of it. In fact, S.F. was involved in chats, messaging, and even sex with other adult males. Additionally, the age difference between S.F. and Vogt is less than five years—S.F. was born in July 2010, and Vogt in December 2005.

If counsel could advocate for a lesser sentence, she would. However, Congress has established 15 years as the mandatory minimum and lowest permissible sentence for this offense. Acknowledging the seriousness of the crime, Vogt respectfully requests that minimum sentence, and the government joins in that recommendation.

I.  **History and Characteristics**

Vogt is 20 years old, and the conduct at issue occurred when he was 19. This is his first experience in custody, and he now faces a 15-year prison sentence. Although the offense involved physical contact, it was between a 14-year-old and a 19-year-old who, by all accounts, described themselves as boyfriend and girlfriend and believed they were in love.

The PSR details Vogt's upbringing and describes it as markedly chaotic. *See* PSR at ¶¶ 49–57. His father struggled with alcohol and drug addiction and was violent toward both Vogt and his mother. PSR at ¶ 50. The abuse and repeated threats against his mother ultimately resulted in criminal charges, and his father was sentenced to four years in prison when Vogt was still an adolescent. *Id.* His father continued to engage in criminal conduct, thereafter, accumulating additional convictions, and remains on state supervision until 2031. *See* PSR at ¶ 60.

Following his parents' divorce, Vogt lived primarily with his mother and had minimal contact with his father. PSR at ¶ 52. The PSR also reflects that Vogt experienced physical abuse at the hands of his mother and grandmother. At the same time, he acknowledges that they attempted to raise him under difficult circumstances and that he was not an easy child to parent—particularly during his

teenage years, when he began using drugs and alcohol.

In addition to the instability within his immediate family, Vogt experienced frequent moves and lived for extended periods in economically disadvantaged and high-crime neighborhoods. The family faced ongoing financial hardship, and during particularly difficult times, Vogt would seek refuge at a neighbor's home to ensure his safety and access to food or would be sent to stay with his grandmother. PSR at ¶ 53-54. Other times, the family lived in shelters. *See* PSR at ¶¶ 54 & 77. Vogt spoke about the domestic violence shelter he stayed in with his mother and brother when he was 12 years old and having lost his virginity to an older adult woman during his time there. PSR at ¶ 77. The neighborhoods in which he lived were marked by prevalent gang activity and widespread criminal conduct, including drug trafficking, firearms, and physical violence. See PSR at ¶¶ 49, 52, 55. Vogt was also the victim of multiple assaults, resulting in concussions and at least one overnight hospitalization. PSR at ¶ 65.

Aside from the external challenges of his living environment, Vogt has faced significant internal struggles with his mental health. He has received multiple diagnoses, including depression, anxiety, and ADHD, and relied on medication for much of his young life. As is common with many individuals managing these conditions, lapses in medication have negatively affected his judgment and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

decision-making. These challenges have contributed to periods of self-harm, suicidal ideation, and extended behavioral health hospitalizations. See PSR at ¶¶ 67–71. Vogt has expressed a willingness to engage in ongoing mental health treatment and counseling, and he hopes to use his time in custody to address these issues in a constructive and productive manner.

Finally, substance abuse has been a significant and persistent challenge in Vogt's life, beginning at the early age of 10, when his father permitted him to experiment with marijuana and continued to use with Vogt during their limited contact. Marijuana quickly became a daily habit for Vogt, consuming much of his time and effort, as he sought the drug and engaged in other harmful behaviors to obtain money to purchase it. PSR at ¶¶ 81–82. This early substance use also disrupted his adherence to prescribed mental health medication, contributing to problematic behavior, physical altercations, and ongoing dysfunction in his life. Over time, his substance use expanded to include cocaine, ecstasy, mushrooms, LSD, codeine, and Percocet. By the ages of 14–15, Vogt was combining Adderall with other substances, particularly LSD, and reported experiencing multiple "bad trips." *Id.* Research has shown that the use of LSD and other hallucinogens in adolescence can exacerbate depression and increase the risk of suicidal ideation. *See generally*, Shaska E, Mulita F, Zenelaj E, Tahiri A, Durmishi E, Gishto T,

Begotaraj E, Leivaditis V. Mental health and the broader consequences of illicit substance abuse beginning in adolescence. Postep Psychiatr Neurol. 2025 Dec;34(4):221-231. doi: 10.5114/ppn.2025.156741. Epub 2025 Dec 8. PMID: 41488583; PMCID: PMC12757830. (found online at https://pubmed.ncbi.nlm.nih.gov/41488583/). This may help in explaining Vogt's significant struggles with depression, self-harm, and suicidal ideations. As Vogt has now been sober for close to eight months, the longest time he has abstained from all substances since turning 10 years old, he has engaged in self-reflection that has led him to realize he was living, for the most part, out of control. At one point, Vogt admitted to undersigned that he is shocked he lived to reach 20 years old because since reaching his teen years, he didn't expect it. *See generally*, Desai, S.; Jain, V.; Xavier, S.; Du, W. Hopelessness, Suicidality, and Co-Occurring Substance Use among Adolescent Hallucinogen Users—A National Survey Study. *Children* 2022, 9, 1906. (found online at https://doi.org/10.3390/children9121906). Now, Vogt is looking ahead and planning for his future, as well as his release from prison, which includes him staying away from drugs and alcohol. To assist him in that goal, Vogt is anxious to participate in substance abuse treatment while in the BOP.

II. **Offense Conduct**

As for the offense conduct, it is well documented in the PSR at paragraphs 11-22. Vogt and the S.F. met each other over the internet and began a relationship in October of 2024. S.F. was 14 years old, and Vogt was 18 years old. In their own words, the two began a dating relationship, and fell in love. Whereas in other cases, we typically see manipulation and coercion by the older person, that does not exist here. Based on the communication between the two, their maturity level appears to be relatively equivalent. The two frequently express their love and their desire for sex with each other over chats, emails, and video chats. One is not more explicit than the other, nor is one pushing the other to do something the other did not suggest on his/her own.

More significantly, the two mirror each other as to their chaotic and dysfunctional lives in many ways which made their connection and bond with each other all the stronger. Both struggle with having an unstable home life. S.F. lives with Dan, a person her mother previously dated, because her mother is in her own words, "too distant and nonexistent" in their lives. Vogt has little to no relationship with his father. Both have lived in difficult conditions and experienced financial struggles within their families. Photos from discovery show S.F.'s home, and particularly her room, covered with clothing and debris, making it impossible to even walk through. Police officers discuss cat feces being on the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

floor in various rooms of the house during interviews with S.F. Vogt's house was condemned for mold infestation.

Both are highly engaged with social media and products of a generation in which relationships and connections often develop online. Additionally, both began struggling with alcohol and substance use at an early age. These shared experiences fostered a sense of understanding and attachment between them. Their connection ultimately led them to defy and circumvent the adults in their lives who were telling them to end it, *ie.* S.F. using school emails to communicate when her phone was blocked or taken away and Vogt hid their relationship after his mother warned him about her being young. Ultimately, it led to the two of them planning Vogt's trip to Wisconsin so they could be together in person. See PSR at ¶ 15.

As for the specifics of the offense, it took place when S.F. was still 14 years old (turning 15 in July) and Vogt, having a birthday at the end of December, turning 19 years old. The CSAM found on Vogt's phone consisted of screen shots of the two-video calling in May and then videos and photos of the two having sexual relations here in Wisconsin in S.F.'s bedroom in June. Many of the photos and videos found on Vogt's phone were ones S.F. took herself, using Vogt's phone. S.F. frequently used Vogt's phone, including having her own fingerprint saved on

his phone so she could get into it. Both were involved in producing it and both were involved in wanting to share it. While Vogt suggested recording their first time together, it was S.F. who said they should post it on "his channel". PSR at ¶ 19.

As for images shared with "Sebastian Wampler," both S.F. and Vogt engaged in the activity together. Vogt had learned from a previous girlfriend that she would send images of herself to adult men, ask them to send images in return, using this tactic to con them out of money. After the men sent pictures ("dickpics"), she would demand money in exchange for not exposing them. This is the extortion he discussed with law enforcement, admitting he and his ex-girlfriend had engaged in this behavior previously. He told S.F. about it. S.F. and Vogt were trying to make some money, engaging in this behavior. The two of them together conversed in chats with Wampler, exchanging photos they took, and received the photos that Wampler sent of himself ("dickpics).

When Vogt was arrested, he was under the influence and when watching his video, it is clear he is quite high. At first, Vogt denied having a sexual relationship with S.F., as well as staying at her house. However, as the conversation went on, he admitted to all of it, including knowing S. F. was under the age of 18.

III. **Argument**

A sentence of fifteen years (180 months) recognizes this is a serious offense. The advisory guideline range is 168 to 210 months, however because the mandatory minimum is 180 months, the applicable guideline range becomes 180 to 210 months. There is no doubt that 15 years is a significant amount of time for anyone, but especially so for someone that has never been in custody before, especially so for someone who is only 20 years old and still in the adolescent stage of brain development.

As argued in prior cases involving young people, the research regarding adolescent brain development sheds light on some of the behavior exhibited by Vogt here. Regardless of what ages are used, it is clear that Vogt is still in the stage of adolescent brain development. *See* Arain M, Haque M, Johal L, Mathur P, Nel W, Rais A, Sandhu R, Sharma S. *Maturation of the adolescent brain.* Neuropsychiatr Dis Treat. 2013;9:449-61. doi: 10.2147/NDT.S39776. Epub 2013 Apr 3. PMID: 23579318; PMCID: PMC3621648, found at https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/. What does that mean? The article by Arain M, Haque M, Johal L, Mathur P, Nel W, Rais A, Sandhu R, Sharma S. describes it in the following way:

> Molecular imaging and functional genomics studies have indicated

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

> that the brain remains in an active state of development during adolescence. In particular, magnetic resonance imaging (MRI) studies have discovered that myelinogenesis continues and the neurocircuitry remains structurally and functionally vulnerable to significant increases in sex hormones,…,which, along with environmental input, influences sex, eating, and sleeping habits. Particularly significant changes occur in the limbic system, which may impact self-control, decision making, emotions and risk-taking behaviors. The brain also experiences a surge of myelin synthesis in the frontal lobe, which is implicated in cognitive processes during adolescence.

*Id.* at 449. As the brain "remains under construction during adolescence," risk-taking and novelty seeking behaviors are common, and "they are more likely to weigh positive experiences more heavily and negative experiences less so than adults." *Id.* at 450. Specifically, with regards to the frontal lobe portion of the brain, the maturation of the prefrontal cortex is still taking place. *Id.* at 453. The prefrontal cortex is responsible for executive brain functioning to include foreseeing and weighing possible consequences of behavior, inhibiting inappropriate behavior and initiating appropriate behavior, and impulse control to include delaying gratification, just to name a few. *Id.*

While research gives us scientific insight into brain development, many of us can draw on personal experience to confirm that teenagers and young adults can be impulsive and frequently act without understanding the consequences of their behavior. This tendency is even more pronounced in individuals diagnosed

OF WISCONSIN, INC.

11

Case 1:25-cr-00194-BBC   Filed 02/18/26   Page 11 of 14   Document 14

with ADHD. Unfortunately, those consequences can be severe and life-changing, like they are for Vogt here, who will spend the next 15 years of his life in prison.

While a fifteen-year sentence takes Vogt out of that stage of adolescent brain, the studies also are clear that aside from genetics and neuroscience, one's environment has a huge impact on a person's brain development, especially during that adolescent stage. *See generally*, Exhibit C. And while the law does not allow for less than fifteen years these studies on brain development help to illustrate why no additional time above that for someone like Vogt is warranted here.

If sentences can actually deter people from committing crimes, a 15-year sentence should serve that purpose. It also provides protection of the public for an extended period based on Vogt being in custody. Additional protection will be provided during his time on supervised release, as well as the fact that he will have to register as a sex offender. Finally, as difficult as it has been, Vogt has acknowledged and accepted that he will be in custody for his actions. He intends to use his time within the BOP to continue taking courses in culinary training, as well as construction. Vogt hopes that upon his release he will be in a position to pursue a career in either field so he can be financially stable and be in a more stable and productive place in his life, starting over in his 30's. Fifteen years is the

minimum time in custody allowed under the law and therefore sufficient but not greater than necessary to meet the needs of sentencing.

IV. **Conclusion**

It is difficult to explain to a 20-year-old and his family that for the first time one is in trouble with the law, it will result in a prison sentence of 15 years. It is especially difficult when Vogt in no way intended to hurt S.F. Quite the opposite, Vogt, just over four years older than S.F., believed the two loved each other and were planning on a future together. Vogt is now facing a 15-year prison sentence, meaning he will not be released until he is in his 30s. In addition, Vogt is one of those clients considered vulnerable in terms of him going to prison. This is due to many factors to include his young age, his mental health challenges, his offense of conviction, and him being designation as a sex offender. Unfortunately, these circumstances are likely to make his time in custody particularly difficult

Unfortunately, that is the reality of entering the BOP in Vogt's situation and one hopes that the BOP will place him at an institution where there is a safe yard and other sex offenders. As Vogt is from Pennsylvania, and his family still resides there, he is requesting a recommendation for placement at a BOP institution in Pennsylvania, to allow for him to have family contact and support while he is serving his sentence.

Vogt is asking the Court to impose the minimum mandatory sentence of fifteen years (180 months). Both parties are recommending that sentence and it is within the advisory guideline range. Vogt is also requesting the Judgment include the following two recommendations on his Judgment: 1) a recommendation for placement in the state of Pennsylvania so he can be near his family; and, 2) participation in the BOP 500-hour RDAP program. Finally, counsel has reviewed the conditions of supervised release appearing at pages 22-28 of the PSR with Vogt who has no objections to them based on the reasoning included therein. Further, Vogt waives reading them in open court, understanding a full copy of them will be reviewed and provided to him when he begins his period of supervised release.

Dated at Green Bay, Wisconsin, this 18th day of February, 2026.

Respectfully Submitted,

**s/ Krista Halla-Valdes**
Krista Halla-Valdes, WI Bar #1091984
Attorney for Zachary J. Vogt
Federal Defender Services of Wisconsin, Inc.
801 E. Walnut Street, Second Floor
Green Bay, Wisconsin 54301-4401
Tel: 920-430-9900
Fax: 920-430-9901
krista_halla-valdes@fd.org